**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| TREVOR SHOUSE, Individually and on behalf of all others similarly situated, | **CASE NO.:** |
| Plaintiff, | |
| vs. | **DEMAND FOR A JURY TRIAL** |
| TEMPUS AI, INC., ERIC LEFKOFSKY, and JIM ROGERS | |
| Defendants. | |

**CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Trevor Shouse ("Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Tempus AI, Inc. ("Tempus" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (defined below).

## NATURE OF THE ACTION

1.        This is a federal securities class action on behalf of all persons and entities that purchased Tempus common stock between August 6, 2024 and May 27, 2025, inclusive (the "Class Period"), against Tempus and certain of its officers and executives (collectively, "Defendants"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.        Based in Chicago, Illinois, Tempus purports to be provide Artificial Intelligence ("AI") enabled precision medicine solutions. The Company claims it develops intelligent diagnostics through the practical application of AI in healthcare to make laboratory tests and connects laboratory results to a patient's own clinical data.

3.        Throughout the Class Period, Tempus branded itself as an AI company despite having little history of generating significant revenues from AI solutions. Instead, the Company generated most of its revenues from acquisitions, genomic testing and data licensing agreements.

4.        During this time, Defendants repeatedly claimed that the contract value and quality of its data licensing agreements with life science companies were secure and expanding. The Company often reported on its relationship with long-term customer AstraZeneca as an example. Importantly, during the Class Period, Tempus announced an expanding contract with AstraZeneca via a joint venture between the Company, AstraZeneca and Pathos AI.

5.        The Company similarly announced a joint venture with SoftBank as a way to generate revenue growth by entering the Japanese market. Tempus additionally claimed high revenue potential for Ambry Genetics ("Ambry"), a target it acquired during the Class Period. The Company claimed Ambry's accelerated growth was on account of its strong relationships with health care providers.

6.      Unbeknownst to investors, Defendants had failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose: (1) Tempus inflated the value of contract agreements, many of which were with related parties, included non-binding opt-ins and/or were self-funded; (2) the credibility and substance of the joint venture with SoftBank was at risk because it gave the appearance of "round-tripping" capital to create revenue for Tempus; (3) Tempus-acquired Ambry had a business model based on aggressive and potentially unethical billing practices that risked scrutiny and unsustainability; (4) AstraZeneca had reduced its financial commitments to Tempus through a questionable "pass-through payment" via a joint agreement between it, the Company and Pathos AI; (5) the foregoing issues revealed weakness in core operations and revenue prospects; and (6) as a result, Defendants' positive statements Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

7.      The truth was revealed on May 28, 2025, when Spruce Point Capital Management, LLC ("Spruce Point") issued a research report on Tempus that raised numerous red flags over Tempus' management, operations and financial reporting (the "Spruce Point Report"). The Spruce Point Report scrutinized Tempus on an array of issues, including: (1) Defendant Eric Lefkofsky and his associates have a history cashing out of companies before public shareholders incur losses or lackluster returns; (2) Tempus' actual AI capabilities are over overstated; (3) board members and other executives have been associated with troubled companies that restated financial results; (4) signs of aggressive accounting and financial reporting; (4) issues with the AstraZeneca and Pathos AI deal that merit scrutiny; and (5) the Company's recent financial

guidance revision reveals weakness in core operations.

8.      On this news, the price of Tempus common stock fell $12.67 per share, or 19.23%, from a closing price of $65.87 per share on May 27, 2025, to a closing price of $53.20 per share on May 28, 2025.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Tempus is headquartered in this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, purchased Tempus common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant Tempus is incorporated under the laws of Delaware with its principal executive offices located in Chicago, Illinois. Tempus' common stock trades on the NASDAQ stock exchange under the ticker symbol "TEM."

16.     Defendant Eric Lefkofsky ("Lefkofsky") founded Tempus and served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board throughout the Class Period.

17.     Defendant Jim Rodgers ("Rodgers") served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

18.     Defendants Lefkofsky and Rodgers (collectively, the "Individual Defendants"), because of their positions with Tempus, possessed the power and authority to control the contents of, *inter alia*, Tempus' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Tempus' reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false

and misleading statements pleaded herein.

19.     Tempus and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Headquartered in Chicago, Illinois, Tempus (formerly, Tempus Labs) markets itself as providing AI enabled precision medicine solutions, including diagnostics, for oncology, cardiology, radiology and depression. The Company purports to develop intelligent diagnostics through the practical application of AI in healthcare to make laboratory tests and connects laboratory results to a patient's own clinical data. Tempus was founded in 2015 by Defendant Lefkofsky. On June 14, 2024, the Company went public on the NASDAQ stock exchange under the ticker symbol "TEM."

21.     Tempus offers three product lines to customers that all rely on synthesizing or analyzing data sets: Genomics, Data and Services, and AI Applications. Specifically, Data and Services offers life science and similar companies libraries of health data they can use for drug development and related efforts. Tempus claims that its tools can provide important contextual information to help improve decision-making across the drug lifecycle. Customers pay Tempus on a per file basis or through a multi-year data licensing agreement to access a database. Tempus reports the purported value of these customer contracts on its financial statement as Total Contract Value and/or Total Remaining Contract Value ("TCV").

22.     While a non-GAAP metric, Tempus heavily promotes TCV as a key indicator of its financial health. Tempus defines TCV as "equal to the total potential value of signed contracts and assumes the exercise of all contract options, all discretionary opt-ins, and no early termination. Remaining TCV excludes any revenue recognized to date on these contracts or any

future adjustments made to the contractual value as a result of amendments or terminations."

23.     AstraZeneca has been a customer of Tempus' Data and Services since at least 2021. Throughout this time, AstraZenca (and other customers) has made several amendments to its agreements with Tempus. Tempus has in turn reported to investors the impact agreement modifications have on TCV.

24.     Prior to the Class Period, Tempus announced a proposed Data and Services agreement between Japan's Soft Bank. The agreement was described as a joint venture agreement with SoftBank, to bring Tempus' AI-enabled precision medicine solutions to Japan ("SB Tempus"). The agreement would close during the Class Period.

25.     Also, during the Class Period, Tempus announced the acquisition of Ambry, a genetics testing company. Tempus and Ambry, however, had a close business relationship spanning back nine years prior to the start of the Class Period. After the acquisition, Ambry became part of Tempus' Genomics division.

26.     Spruce Point Capital Management, LLC ("Spruce Point") is a New York-based investment management firm focused on research driven short-selling, value and special situation investment opportunities. At the end of the Class Period, Spruce Point published a forensic research report on Tempus' operations, management, and financials.

<u>**Defendants' Materially False and Misleading Statements**</u>

**The Second Quarter 2024 Financial Results**

27.     The Class Period begins on August 6, 2024. On that day, Tempus issued a press release announcing the Company's financial results for its financial results for the second quarter of 2024, ending June 30, 2024 ("2Q24 Press Release"). The 2Q24 Press Release stated, among other things, "Revenue increased 25% year-over-year to $166.0 million in the second

quarter of 2024," "Data licensing revenue growth accelerated to 40% year-over-year", and that Tempus "[e]stablished a joint venture with Softbank to enter the Japanese market." The 2Q24 Press Release included the following table summarizing Tempus' Data and Services financial results:

**Data and Services Gross Profit & Gross Margin**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Data and services revenue | $ 53,645 | $ 40,493 | $ 96,896 | $ 74,059 |
| Cost of revenues, data and services | 22,132 | 13,807 | 37,420 | 25,200 |
| Gross profit, data and services | $ 31,513 | $ 26,686 | $ 59,476 | $ 48,859 |
| Stock-based compensation expense | 7,229 | - | 7,229 | - |
| Employer payroll tax related to stock-based compensation | 119 | - | 119 | - |
| Non-GAAP gross profit, data and services | $ 38,861 | $ 26,686 | $ 66,824 | $ 48,859 |
| | | | | |
| Gross margin, data and services | 58.7% | 65.9% | 61.4% | 66.0% |
| Stock-based compensation expense | 13.5% | 0.0% | 7.5% | 0.0% |
| Employer payroll tax related to stock-based compensation | 0.2% | 0.0% | 0.1% | 0.0% |
| Non-GAAP gross margin, data and services | 72.4% | 65.9% | 69.0% | 66.0% |

28.     On the same day, Tempus filed a Form 10-Q with the SEC that reported its financial results for the second quarter of 2024, ending June 30, 2024 ("2Q24 10-Q"). In the 2Q24 10-Q, Tempus reported it had completed a joint venture agreement with SoftBank, to bring Tempus' AI-enabled precision medicine solutions to Japan ("SB Tempus"). The 2Q24 10-Q stated, in relevant part:

> On May 18, 2024, the Company entered into a Joint Venture Agreement (the "Joint Venture Agreement"), by and among SoftBank Group Corporation ("SoftBank"), SoftBank Group Japan Corporation, the Company and Pegasos Corp. (the "Joint Venture"), pursuant to which the Joint Venture will engage in certain business activities in Japan similar to those conducted by

the Company in the United States, including performing clinical sequencing, organizing patient data, and building a real world data business in Japan. The Joint Venture closed on July 18, 2024. ***The Company and SoftBank capitalized the Joint Venture with ¥30,000,000,000 (approximately $191.1 million based on foreign exchange rates as of July 18, 2024), split evenly between the two parties and each received 50% of the Joint Venture's outstanding capital stock and board seats.[1]***

In connection with entering into the Joint Venture Agreement, the Company entered into the following agreements with the Joint Venture: a Data License Agreement (the "Data License Agreement"), which became effective immediately upon signing the Joint Venture Agreement; an Intellectual Property License Agreement (the "IP License Agreement") and a Services Agreement, each of which became effective on July 18, 2024 upon closing. Under the Data License Agreement, the Company granted the Joint Venture a limited, non-exclusive, transferable license with a limited right to sublicense certain de-identified data for certain specified uses solely in Japan. ***Under the Data License Agreement, the Joint Venture paid the Company ¥7,500,000,000 (approximately $47.8 million based on foreign exchange rates as of July 18, 2024) in exchange for the license to the Initial Records Batch (as defined in the Data License Agreement) and an additional ¥7,500,000,000 (approximately $47.8 million based on foreign exchange rates as of July 18, 2024) pursuant to the IP License Agreement in exchange for a non-exclusive license with respect to certain of the Company's technologies for certain specified uses solely in Japan.*** Under the Services Agreement, the Company will provide the Joint Venture with certain services.

The foreign exchange gain/loss on the exchange of funds on July 18, 2024 upon closing of the Joint Venture was not material.

29.     Also on August 6, 2024, Tempus published a Q2 2024 Overview Letter ("2Q24 Letter") to provide investors with "a summary of our financial and operating results, along with some context as to how we view those results, as it relates to both the near and long term." Regarding Tempus' Data and Services business, the 2Q24 Letter stated:

---

[1] Emphasis added to bolded and italicized words unless otherwise noted.

Data

Our Data and Services business experienced accelerated growth in the quarter, delivering $53.6 million in revenue versus $40.5 million in Q2 2023, up 32.5% year-over-year, largely driven by our Insights business (Data Licensing), which not only grew faster than our Services business (Clinical Trials), but also had higher Non-GAAP gross margin of 72.4% for the quarter. ***We ended the quarter with >$900 million in total remaining contract value, which highlights the continued adoption and progress of our Data and Services offerings. Most of these contracts are multi-year, with total remaining contract value representing data and services that will be provided over the remaining term of each contract.***

Notably, we signed an agreement with Novartis to expand the amount of data we license them which we expect to deliver throughout 2024, we signed a five year agreement with Takeda which was a significant expansion in size and scope to our existing agreement, we renewed our agreement with Astellas adding two more committed years to their data license, and we signed a large study with United Therapeutics to work on pulmonary hypertension models. All were big wins in the quarter for our Data & Services business, so we're excited to see the momentum continue.

30.    During the accompanying earnings call held that same day, Defendants Lefkofsky and Rogers had the following responses to an analyst from TD Cowen (Research) who asked for further explanation on how to consider the selective inclusion of deals in the TCV figure:

**Defendant Lefkofsky**
Yes. I mean we obviously didn't include numbers for a variety of reasons, not the least of which we're sensitive to -- that we've got partners and those things. There are times that they're appropriate. Times, they're not. ***These are all good-sized deals for us***. They're -- I think what we represented in the quarter is that we had multiple large pharma companies, and we didn't list all the smaller biotechs that we also signed various agreements with -- but we had kind of four larger pharma companies that all did significant deals in the quarter. And for us, it was just a sign of both in terms of the revenue we delivered in our Insights business and the bookings we delivered Q2 was a really strong data licensing quarter, and that

was good to see.

We expected to see if it was good to see, and we expect that momentum to continue at least in the foreseeable future. ***But we don't really comment on the size of these deals unless they get so big that we kind of have effectively no choice. And these deals were really good size deals, but they weren't $300 million deals where we would be talking about it.***

**Defendant Rogers**
***And I would also add that the total remaining contract value is still north of $900 million.*** So again, as Eric pointed out, we delivered a lot of revenue, but obviously, ad bookings that kind of refilled that total remaining contract value. In the other metric, which we present annually, is net revenue retention, but these are again the highlighting ones that we had agreements in place, and we're able to expand those in subsequent years. So we're excited about all the agreements that were mentioned in the release.

**Defendant Lefkofsky**
Yes. It's really -- another -- just to jump on Jim's comment, as one of the most exciting things about the Astellas indicated arrangements in addition to Novartis', these are people that had multiyear agreements and re-up for larger agreements or we up for larger periods of time. And so that's what you want to see -- Tempus is only eight years old, right? We've been licensing data for five or six years. ***So what you want -- and which means that most of these -- most of our clients have only been clients for two or three years on the data side. So seeing big renewals occur over and over again is a really good sign that we're adding a ton of value, and that value is resonating with our clients.***

31.     During that same earnings call, a Stifel, Nicolaus & Company ("Stifel") analyst asked Defendants to explain the Company's confidence on a TCV of $900 million in revenues, of which $300 million was from two clients that had not formally renewed." In response, Defendant Lefkosky stated:

Yes. I mean, they've actually -- both contracts have work actually already been extended in terms of timing. So I think in one of the amendments, we add another year, I think, to AstraZeneca, something like that. And we have a longer duration now going out with GSK as well. So we have -- we've got, I don't know the exact dates, but I'll say roughly 2027, '28, summer of '27, '28. So these

11

contracts go kind of years in the future, ***so there's no immediate clips coming up, and we feel good about all of our larger deals in terms of the value that we're delivering, and we would suspect that the vast majority of all our big deals renew and hopefully expand.***

**The Third Quarter 2024 Financial Results**

32.     On November 4, 2024, Tempus issued a press release announcing the Company's financial results for its financial results for the third quarter of 2024, ending September 30, 2024 ("3Q24 Press Release"). The 3Q24 Press Release announced Tempus had entered into an agreement with genetic testing company Ambry and included a quote on the deal from Defendant Lefkofsky stating in part, "Ambry is uniquely positioned given that its revenues are currently growing at north of 25% a year and it generates meaningful EBITDA and cash flow."

33.     The 3Q24 Press Release also announced that "[r]evenue increased 33.0% year-over-year to $180.9 million in the third quarter of 2024," and "Non-GAAP Data and services gross margin was 78.3% in the third quarter of 2024, compared to 60.5% in the third quarter of 2023, led by Insights, or data licensing revenue, which grew 86.6% year over year." The 3Q24 Press Release included the following table summarizing Tempus' Data and Services financial results:

*Data and Services Gross Profit & Gross Margin*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2024 | 2023 | 2024 | 2023 |
| Data and services revenue | $ 64,507 | $ 39,242 | $ 161,403 | $ 113,301 |
| Cost of revenues, data and services | 14,964 | 15,490 | 52,384 | 40,690 |
| Gross profit, data and services | $ 49,543 | $ 23,752 | $ 109,019 | $ 72,611 |
| Stock-based compensation expense | 916 | — | 8,145 | — |
| Employer payroll tax related to stock-based compensation | 43 | — | 162 | — |
| Non-GAAP gross profit, data and services | $ 50,502 | $ 23,752 | $ 117,326 | $ 72,611 |
| Gross margin, data and services | 76.8% | 60.5% | 67.5% | 64.1% |
| Stock-based compensation expense | 1.4% | 0.0% | 5.0% | 0.0% |
| Employer payroll tax related to stock-based compensation | 0.1% | 0.0% | 0.1% | 0.0% |
| Non-GAAP gross margin, data and services | 78.3% | 60.5% | 72.7% | 64.1% |

34.     Also on November 4, 2024, Tempus published a Q3 2024 Overview Letter ("3Q24 Letter") to provide investors with "a summary of our financial and operating results, along with some context as to how we view those results, as it relates to both the near and long term." With respect to the Company's TCV and Tempus' acquisition of Ambry, the 3Q24 Letter stated:

> Data Our Data and Services business experienced accelerated growth in the quarter, delivering $64.5 million in revenue versus $39.2 million in Q3 2023, up 64.4% year-over-year, largely driven by our Insights business (Data Licensing), which not only grew faster than our Services business (Clinical Trials), but also had higher Non-GAAP gross margin of 84.0% for the quarter. *We ended the quarter with >$900 million in total remaining contract value.*
>
> ***
>
> *First, we don't take large acquisitions lightly; we actually have a*

13

*bias against them.* Over the past 9 years we have come to know and admire a few companies in our space - Ambry is one of them.

*We've been able to watch them grow and mature as a business. Over the past few years, their hereditary cancer portfolio has become best in class, which has led to their recent acceleration of revenues and market share gains.* In addition, their product line is uniquely situated to allow for our expansion into rare disorders, pediatrics, cardiology, and other areas. Finally, their focus on scale and efficiency allowed them to achieve something that is very rare in our space – a genomics business with revenues growing at more than 25% that is also generating positive adjusted EBITDA and free cash flow. Upon closing the transaction, we too expect to join this club going forward on a consolidated annual basis.

35.     During the accompanying earnings call held that same day, Defendant Lefkofsky had the following response to an analyst from Morgan Stanley on how Ambry's 25% growth was sustainable given the uneven growth of its peers:

[W]e have always felt it's important to be in hereditary screening. It's important to be in somatic and liquid testing for therapy selection. It's important to be an MRD and monitoring. So this fits kind of squarely within our strategic plans and current activities. Beyond that, *the business has actually been accelerating their growth rate.* And if you look at the landscape, we believe the hereditary market is quite stable, more and more insights are relevant to inherited cancer risk understanding. *And so there are certainly growth in that space. Ambry, in particular, seems to be taking market share from others. We don't see any signs that that's going to slowdown and even though the law of big numbers does tend to bring down growth rates, which is true for us and will be true for them, we think that it will be a meaningful grower for some period of time.*

*And there's nothing that we saw in the past year where we really dug into the business deeply that led us to think there was some kind of systemic slowdown. So we think the business will perform well, it will grow. It will make more money and it fits squarely within our footprint.*

36.     During that same earnings call, an analyst from TD Cowen asked the Company to confirm whether the Ambry deal was a competitive sales process, which he

14

assumed was not. In response, Defendant Lefkosky stated:

> ***So in terms of a competitive process, Ambry did run a competitive process.*** They – the – I think, hired banks and looked at their options. You'd have to kind of dig in – there are public companies, so you can kind of dig into some of their historic comments. But – and I'm not an expert on Konica Minolta, but I know at one point, they had Ambry plus another business that were bolted together. I think for a period of time, they were looking to sell both and then decided to split it out. ***So it was a process, but it was a process with twists and turns. We were fortunate that we knew the business well. We were watching it closely. We were interacting with them as a partner and we were able to kind of watch their performance over long horizons of time to really get comfortable that this business was durable,*** that the economics were going to – we're improving and that we thought this was going to be a highly synergistic asset for us to acquire under the right terms and in a way that it accelerates our business both in terms of the products we take to market and our journey to get to EBITDA and cash flow positive, which we know are.

37.     Later in the same earnings call, an analyst from William Blair & Co. asked how the Ambry deal accelerates or grows health system relationships for Tempus. In response, Defendant Lefkosky stated:

> So I think in terms of the relationships that Ambry has on the payer side, they obviously are primarily an in-network lab. We're primarily out of network lab. So in some of those discussions, they've got a lot of history in dealing with the commercial payers. And then on the health system side, as I mentioned before, they're primary call point is genetic counselors or we're primarily dealing with oncologists. ***So again, just deepening those relationships with across kind of the entire ecosystem on the provider side, we believe we'll kind of strengthen our position with the hospitals.***

38.     During that same earnings call, an analyst from Morgan Stanley asked the Company to clarify whether TCV grew sequentially and that it was moving in right direction. In response, Defendant Rogers stated:

> So as we noted at the end of Q2, it was north of $900 million, still north of $900 million at the end of Q3. We obviously recognize a lot of revenue in Q3 from the number that was there at Q2. So

15

again, *we continue to refill the bucket and we think that at that level of north of $900 million obviously gives us very good forward-looking visibility into the next several years of data licensing*.

In terms of the step-up in Q4, Q4 is historically our largest quarter from a data perspective. Oftentimes, we have projects to kind of follow pharma cycling budgets and so -- our budgeting cycles. And so this is not atypical for us to have a step-up in Q4 on the data licensing side.

**The Fourth Quarter and Full Year 2024 Financial Results**

39.     On February 24, 2025, Tempus issued a press release announcing the Company's financial results for its financial results for the fourth quarter and full year 2024, ending December 31, 2024 ("4Q24 Press Release"). The 4Q24 Press Release announced Tempus had closed the acquisition of Ambry Genetics and "[e]nded the year with $940 million in Total Remaining Contract Value and 140% net revenue retention. The 4Q24 Press Release included the following table summarizing Tempus' Data and Services financial results:

*Data and Services Gross Profit & Gross Margin*

| | Three Months Ended December 31, | | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2024 | 2023 |
| Data and services revenue | $ 80,246 | $ | 55,499 | $ | 241,649 | $ 168,800 |
| Cost of revenues, data and services | 16,434 | | 15,792 | | 68,818 | 56,482 |
| Gross profit, data and services | $ 63,812 | $ | 39,707 | $ | 172,831 | $ 112,318 |
| Stock-based compensation expense | 385 | | — | | 8,530 | — |
| Employer payroll tax related to stock-based compensation | 202 | | — | | 364 | — |
| Non-GAAP gross profit, data and services | $ 64,399 | $ | 39,707 | $ | 181,725 | $ 112,318 |
| Gross margin, data and services | 79.5% | | 71.5% | | 71.5% | 66.5% |
| Stock-based compensation expense | 0.5% | | 0.0% | | 3.5% | 0.0% |
| Employer payroll tax related to stock-based compensation | 0.3% | | 0.0% | | 0.2% | 0.0% |
| Non-GAAP gross margin, data and services | 80.3% | | 71.5% | | 75.2% | 66.5% |

40. Also on February 24, 2025, Tempus published a Q4 2024 Overview Letter ("4Q24 Letter") to provide investors with "a summary of our financial and operating results, along with some context as to how we view those results, as it relates to both the near and long term." With respect to the Company's TCV and Tempus' integration of Ambry, the 4Q24 Letter stated:

> In the quarter, we signed a large data agreement with Boehringer Ingelheim, who is using our data for biomarker development and novel discovery efforts, and with Illumina, who is using our data to improve aspects of their research and development. Finally, we had a pick-up in the quarter, related to the accounting treatment of AstraZeneca's warrant expiring - we had been discounting the data we were providing to AstraZeneca and when the warrant lapsed, the discount lapsed with it, allowing us to recapture the discount we had been accruing. We also had a large data delivery of near similar size that we expected to go out in Q4 slip into early 2025.
>
> So all in, with put and takes, our data business continues to hum

along; performing well throughout the year. ***Not only did we sign agreements with Novartis, BioNTech, Merck EMD, Takeda, Astellas, Illumina, and United Therapeutics, we ended the quarter with >$940 million in total remaining contract value, an increase from Q3 and year end 2023. Given our size, ending the year with a higher total remaining contract value than when we started is a clear indication that our data products are resonating.*** It's also the reason our net revenue retention skyrocketed to 140% in 2024. While we are incredibly proud that our clients on average spent 40% more with us than they did the year before, we recognize this statistic is likely to come down over time, as anything north of 100% is a win.

***

As it relates to Ambry's full year 2024 results, their revenues in 2024 were $315 million, representing approximately 30% growth year-over-year. It's worth noting that Ambry benefited in 2024 from improved reimbursement and volume tailwinds related to some of its competitors that drove enhanced growth in 2024. Their Non-GAAP gross margin was 66.8% in 2024 and their Adjusted EBITDA was $51.0 million.

41.     During the accompanying earnings call held that same day, Defendant Rogers had the following response to an analyst from Bank of America how investors should think about the $940 million in TCV going forward:

I'd say the number did grow higher throughout the course of the year. And we also kind of grew — the amount of revenue that came out of that was at a record level as well. And so any growth in that number when you're kind of achieving kind of the revenue growth that we saw you'd be very happy with. The way that we kind of view the total remaining contract value is it at a healthy enough level to kind of give you some visibility into the next several years of revenue. And at the level that it's at given the amount of revenue that we recognize in a given year, it provides that level of visibility. As we've previously kind of talked about when we get kind of larger deals then that can result in some fluctuation of those.

And you don't sign kind of very large deals every single quarter. We highlighted some of the larger deals that we signed in the quarter with BI and Illumina. And again we think that it's at a very healthy level for us to achieve the targets that we're looking to

achieve.

42. Defendant Lefkosky followed Defendant's Rogers comment above with:

> Yeah. And **the punch line is, its lumpy, right**? So the fact that it's growing and the fact that it — and the fact that our net revenue retention is so high means the core business is really, really strong, right? I mean in simple terms if you've got about $1 billion of total contract value and you've delivered $250 million in a year to have the number grow you had to basically sign more than that. So that's awesome. But yes, I mean in a perfect world you'd like it to grow by your growth rate. So if you think of it like, yeah, we had — if it doesn't — if our growth rate is such that you have to basically sign all the data you delivered plus another let's say whatever 30% then maybe you'd want it to grow by $75 million.

43. During that same earnings call, an analyst from Stifel asked the Company to confirm any change in confidence or the terms that exist with the $300 million in contract renewals for AstraZeneca and GlaxoSmithKline. In response, Defendant Rogers and Lefkosfsky stated:

> **Defendant Rogers**:
> So just a reminder, though, that kind of $300 million of opt-ins that we've highlighted in the total remaining contract value are kind of the last 18 months or so of the AstraZeneca and GSK agreements. **There's no updates. We're still several years away from kind of hitting those renewals and kind of no change in our confidence in terms of them don't renew.**
>
> \*\*\*
>
> **Defendant Lefkosfsky:**
> The range of those renewals is like 2027 to 2029. **So we're still years away.**

### The April 23, 2025 AstraZeneca and Pathos Agreement Announcement

44. On April 23, 2025, Tempus is a press release announced the signing of "expanded" agreements with AstraZeneca and Pathos (the "Pathos Agreement"), that stated in part.

Tempus AI, Inc. (NASDAQ: TEM), a technology company leading the adoption of AI to advance precision medicine and patient care, today announced multi-year, strategic collaborations with AstraZeneca (LSE/STO/Nasdaq: AZN) and Pathos AI, Inc., in which the companies will work together to build a multimodal foundation model in oncology which can be used to gather biological and clinical insights, discover novel drug targets, and develop therapeutics for the broader oncology community.

Tempus' de-identified oncology data will be used to build the foundation model. Upon completion, the model will be shared among all three parties to advance their individual efforts to improve patient care. The agreements include $200 million in data licensing and model development fees to Tempus.

***The agreement with AstraZeneca expands on the strategic partnership between the two companies announced in 2021*** and aims to leverage Tempus' AI-enabled platform and vast repository of multimodal data to advance novel therapeutic programs in oncology on a global scale.

### The First Quarter 2025 Financial Results

45.    On May 6, 2025, Tempus issued a press release announcing the Company's financial results for its financial results for the first quarter of 2024, ending March 31, 2025 ("1Q25 Press Release"). The 1Q25 Press Release announced the Pathos Agreement as "resulting in $200 million in data licensing and model development fees over the next 3 years," and the Company increased "full year 2025 revenue guidance to $1.25 billion," and "expect positive Adjusted EBITDA of $5 million for full year 2025. The 4Q24 Press Release included the following table summarizing Tempus' Data and Services financial results:

*Data and Services Gross Profit & Gross Margin*

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2025 | 2024 |
| Data and services revenue | $ 61,933 | $ 43,251 |
| Cost of revenues, data and services | 15,751 | 15,288 |
| Gross profit, data and services | $ 46,182 | $ 27,963 |
| Stock-based compensation expense | 611 | — |
| Employer payroll tax related to stock-based compensation | 44 | — |
| Non-GAAP gross profit, data and services | $ 46,837 | $ 27,963 |
| Gross margin, data and services | 74.6% | 64.7% |
| Stock-based compensation expense | 1.0% | 0.0% |
| Employer payroll tax related to stock-based compensation | 0.1% | 0.0% |
| Non-GAAP gross margin, data and services | 75.6% | 64.7% |

46.     Also on May 6, 2025, Tempus published a Q1 2025 Overview Letter ("1Q25 Letter") to provide investors with "a summary of our financial and operating results, along with some context as to how we view those results, as it relates to both the near and long term."  With respect to the Company's TCV and Tempus' Pathos Agreement, the 1Q25 Letter stated:

> We ***also announced our expanded collaboration with AstraZeneca*** and Pathos AI to build the first foundation model within oncology leveraging our data… [T]his agreement is exciting because we believe these types of models will have a tremendous impact on patient care. ***While not a contributor to Q1 revenues, it does increase our Total Remaining Contract Value by $200 million, resulting in a Total Remaining Contract Value as of April 30th in excess of $1 billion. Revenue associated with this agreement will be recognized over the three year term. Given AstraZeneca is our longest standing data customer and our first strategic collaboration, we're very pleased that they have expanded our relationship in such a significant manner - further validating the value of our data for biopharma.*** It should also be noted that this deal does not impact our current licensing arrangement with AstraZeneca which remains intact and serves a

21

different purpose. The data being licensed here can only be used to build a foundation model, whereas AstraZeneca's current data license is for files they can bring into their environment and use for both discovery and regulatory purposes.

47.     During the accompanying earnings call held that same day, Defendant Lefkofsky provided introductory remarks, stating in part:

So I would say, all in, the company is performing super well, which was in my quote. Revenues are up. Gross profit is up. Both are growing nicely. We're managing our costs, which is producing nice year-over-year operating leverage. In addition, I'll highlight just one other big piece of news, which we put out about a week ago, which is we announced a three-year $200 million data and modeling license agreement with AstraZeneca and Pathos in April to build the world's largest foundation model in oncology. This is big for a few reasons.

**One is it brings our total remaining contract value to greater than $1 billion as of April 30.** It also allows us to take over 300 petabytes of data, which includes this really rich multimodal data set connected to outcomes, and use that to build a foundation model, which is -- in addition to the data licensing, which is quite positive for us. Also, the cost of compute is not small, and AZ and Pathos are covering a significant portion of that.

When the model is complete, which we expect the first version of the model will be completed in about 9 to 12 months, each party will get a copy, AZ and Pathos to advance their drug discovery efforts and Tempus to advance its diagnostic and data products. **Given that AstraZeneca is our longest-standing client, actually was our first strategic collaboration, we couldn't be more excited to be expanding our relationship in such a significant manner**, I think, kind of further validating the value we're providing to lots of biopharma clients.

It's also worth noting this is a nonexclusive agreement. We can essentially license data and build models with others, and we hope to do so in the
future. And as such, this represents an entirely new category for us.

48.     During earnings call, an analyst from Morgan Stanley sought to clarify the details of the "complicated" Pathos Agreement and how revenue would be shown on the profit

and loss statement. In response, Defendant Lefkofsky and Rogers stated:

**Defendant Lefkofsky**

***[T]his is $200 million of data licensing and real data revenue.***

And so somebody's got to be willing to sign up for something that significant. And it's expensive. And so even though there's a ton of excitement, we have to turn that into tangible agreements and tangible projects and kick those off.

In the case of AZ and Pathos, AstraZeneca was a client of ours. They also had spent some time with Pathos and got to know that team. I think there was -- independent of the Tempus relationship, they were exploring some different ideas together.

And so I think when we began discussing this idea of building a foundation model, it made sense for them to want to have this be a three-way agreement, whereby they can make a sizable investment and commit some of the attributes they have, but they also could leverage a bunch of the work that Pathos had done and then obviously leverage our data and the work we had done. ***And so it came together as a three-way partnership but just as easily could have come together as a two-way partnership between us and the pharmaceutical company and not involve Pathos.***

And I'll let Jim cover the rev rec.

**Defendant Rogers**

Yes. In terms of the revenue recognition, I think the easiest way to think about it is we have a $200 million kind of data license to Pathos that is specifically related to building the foundational models. So the data can only be used for that purpose as AZ, Pathos and Tempus work together to build that foundational model. There are some cash flows between AZ to Tempus over to Pathos, but there's no revenue recognition impact of that. ***And so the $200 million will be recognized*** -- it ramps a little bit over the three-year period but roughly ratably over the three-year term, during
which the model will be built.

***So this license is no different than the other -- the large subscriptions that we have.*** The upfront payment from Pathos to Tempus doesn't triggerany revenue recognition upon that payment. It's the three-year subscription similar to the other large multiyear

deals that we currently have.

49.     During same earnings call, Defendant Rogers responded to a question by an analyst from TD Cowen who asked Defendants to provide "any qualitative color" on the TCV related to the AstraZeneca, by stating in part:

> [R]egarding the Insights business and the Data and Services business, it's also off to a good start. As we mentioned, the whole Data and Services business growing more than 40%, the Insight business growing 58%. So we were very fortunate coming into the year*. We had $940 million of real contract value that was yet to be delivered.*
>
> And so delivering on those subscriptions and then adding additional deals in Q1, obviously, *the highlight coming in, in April with [AstraZeneca], which pushes the total remaining contract value over $1 billion for the first time ever.* And so that forward-looking visibility that those contracts provide allow us to feel really confident about the data number for the balance of the year and into the next several years.

50.     The above statements identified in ¶¶ 27-49 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants failed to disclose: (1) Tempus inflated TCV to include contract agreements that were related party contracts, non-binding opt-ins and self-funded; (2) the credibility and substance of the SB Tempus arrangement was at risk because it gave the appearance of "round-tripping" capital to create revenue for Tempus; (3) Tempus-acquired Ambry had a business model based on aggressive and potentially unethical billing practices that risked scrutiny and unsustainability; (4) long time customer AstraZeneca, had reduced its financial commitments to Tempus through a questionable "pass-through payment" via a joint agreement between it, the Company and Pathos AI; (5) the foregoing issues revealed weakness in

core operations and revenue prospects; and (6) as a result, Defendants' positive statements Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Is Revealed**

51.     On May 28, 2025, Spruce Point issued press release announcing it had published a research report on Tempus that raised numerous red flags on Tempus' management, operations and financial reporting (the "Spruce Point Report"). The Spruce Point Report scrutinized Tempus on an array of issues, including:

- Defendant Eric Lefkofsky and his associates have a history cashing out of companies before public shareholders incur losses or lackluster returns;

- Tempus' AI actual capabilities are over overstated;

- board members and other executives have been associated with troubled companies that restated financial results;

- signs of aggressive accounting and financial reporting;

- key strategic partnerships and deal announcement with AstraZeneca and Pathos AI merit scrutiny; and

- the Company's recent financial guidance revision reveals weakness in core operations.

52.     Specifically, the Spruce Point Report claimed that Tempus' reporting of more than $1 billion in TCV near the end of the Class Period was significantly overstated by approximately $600 million. The Spruce Point Report explained that "the TCV that Tempus reports is aggressively defined with non-binding opt-ins, improbable milestone payments, related-party transactions, and self-funded commitments."

53.     The Spruce Point Report further detailed how, "[c]ontrary to the Company's messaging, this latest deal with Pathos is not a true extension of the AstraZeneca relationship, but rather a restructuring that we believe underscores the ongoing erosion of the commitment between Tempus and AstraZeneca." As an example, the Spruce Point Report highlighted a $35 million "pass-through payment" in the Pathos Agreement, whereby AstraZeneca would pay Tempus, only for Tempus to pay Pathos. The Spruce Point Report claimed the transaction was being improperly recognized as revenue when it was a backhanded way for AstraZeneca to reduce its financial obligations to Tempus.

54.     The Spruce Point Report also claimed the SB Tempus venture used "aggressive financial engineering" that gives the appearance of "round-tripping capital" to create revenue for Tempus." The Spruce Point Report explained that "the Company invests $95 million into the joint venture and then receives nearly the same amount back in the form of license payments." The Spruce Point Report then claimed Tempus recognizes the payments as revenue "and total contract value, potentially boosting its reported financial performance with funds that originated from its own investment."

55.     The Spruce Point Report additionally explained Spruce Point's view on how "Ambry's rapid revenue growth is driven by aggressive used of the ambiguous billing code 81479." Ambry was also scrutinized for "routinely conducting concurrent DNA and RNA testing increases costs to patients and payors, possibly prioritizing revenue over clinical necessity."

56.     As a result, investors immediately reacted to the Tempus revelations. The price of Tempus common stock fell $12.67 per share, or nearly 19.23%, from a closing price of $65.87 per share on May 27, 2025, to a closing price of $53.20 per share on May 28, 2025.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Tempus common stock between August 6, 2024 and May 27, 2025, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, common stock of Tempus actively traded on the NASDAQ under the symbol "TEM." Millions of Tempus shares were traded publicly during the Class Period on the NASDAQ.  As of May 2, 2025, the Company had more than 168 million shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Tempus or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

Plaintiff has no interests that conflict with those of the Class.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)      whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Tempus;

d)      whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Tempus;

e)      whether the market price of Tempus common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the

expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

63.     The market for Tempus common stock was an open, well-developed, and efficient market at all relevant times. As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Tempus' common stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased Tempus' common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Tempus and have been damaged thereby.

64.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Tempus' business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's common stock at artificially inflated prices and were

harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

65.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

66.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Tempus, their control over, receipt, and/or modification of Tempus's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Tempus, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

67.     As a result of their purchases of Tempus's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

68.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward- looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Tempus who knew that the statement was false when made.

## LOSS CAUSATION

69.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

70.     As detailed herein, during the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of Tempus's common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Tempus' stock fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF
## PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

71.     The market for Tempus common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Tempus common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Tempus common stock and market information relating to Tempus and have been damaged thereby.

72.     At all times relevant, the market for Tempus common stock was an efficient market for the following reasons, among others:

        a)    Tempus was listed and actively traded on the NASDAQ, a highly efficient and automated market;

        b)    As a regulated issuer, Tempus filed periodic public reports with the

SEC and/or the NASDAQ;

c)    Tempus regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)    Tempus was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

73.    As a result of the foregoing, the market for Tempus common stock promptly digested current information regarding Tempus from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Tempus common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

74.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects— information that Defendants were obligated to disclose but did not—positive proof of reliance is

not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

75.     Plaintiff repeats and realleges each and every allegation contained ¶¶ 1-74 as if fully set forth herein.

76.     Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tempus's common stock; and (iii) cause Plaintiff and other members of the Class to purchase Tempus common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

77.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Tempus common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons

as alleged below.

78.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Tempus's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Tempus's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Tempus and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

79.     Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial

condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

80.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Tempus's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock.  As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

81.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Tempus common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the securities trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased Tempus common stock during the Class Period at artificially inflated prices and were damaged thereby.

82.     At the time of said misrepresentations and omissions, Plaintiff and other

members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Tempus was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Tempus common stock, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

83.     By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against All Individual Defendants**

85.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

86.     The Individual Defendants acted as controlling persons of Tempus within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to

copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

88.     As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

89.     WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)     Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)     Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)     Awarding Plaintiff and the members of the Class pre-judgment and

post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)    Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

90.    Plaintiff demands a trial by jury.

Dated: June 12, 2025                                Respectfully submitted,

By: */s/ Andrew J. Shamis*

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis
IL Bar No.: 6337427
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
Email: ashamis@shamisgentile.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg (*pro hac vice* forthcoming)
Gabriel Mandler (*pro hac vice*
forthcoming) 20900 NE 30th Avenue, Suite
417 Aventura, FL 33180
Tel: (786) 289-9471
Fax: (786) 623-0915
Email: scott@edelsberglaw.com
Email: gabriel@edelsberglaw.com

*Attorneys for Plaintiff Trevor Shouse*

**SWORN CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Trevor Shouse, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification and to institute legal action against Tempus AI, Inc. ("Tempus") and other defendants.  I have reviewed a complaint filed against Tempus and other defendants, alleging violations of the federal securities laws on behalf of all those who purchased or otherwise acquired Tempus securities, and authorize its filing and/or the filing of a Lead Plaintiff motion.

2.      I did not purchase or acquire Tempus securities at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.

4.      My transactions in Tempus securities during the Class Period are identified in the annexed table.

5.      I have not served nor sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years.

6.      I will not accept payment for serving as a lead plaintiff beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this <u>11th</u> day of June, 2025.

_____
Trevor Shouse

**ANNEX**

**TABLE OF TRANSACTIONS**

**Tempus AI, Inc.**
**NASDAQ: TEM**

| TICKER | DATE | TRANS TYPE | NO. SHARES | PRICE |
|--------|------|-----------|-----------|-------|
| TEM | 3/31/2025 | BUY | 25 | $46.19 |
| TEM | 2/18/2025 | BUY | 25 | $84.59 |
| TEM | 2/14/2025 | BUY | 12 | $86.95 |
| TEM | 1/21/2025 | BUY | 10 | $55.80 |
| TEM | 1/21/2025 | BUY | 20 | $47.03 |
| TEM | 4/21/2025 | SELL | 10 | $40.66 |
| TEM | 3/31/2025 | SELL | 17 | $46.92 |
| TEM | 1/21/2025 | SELL | 15 | $46.90 |